The next matter, number 25-1441, Janeth DeSilva v. The Guardian Life Insurance Company of America. At this time, would counsel for the appellant please introduce yourself on the record to begin. Good morning, good afternoon, your honor. Smala Rafiq for the plaintiff, for the appellant Janeth DeSilva. May I reserve two minutes for rebuttal, your honor? You may. Thank you. I'd like to begin today with one fact that has become relevant in this litigation but was not raised during the ERISA Internal Appeal Review process, and that is Mr. DeSilva's annual mileage as detailed on his tax returns. I'm starting there because the focus on Mr. DeSilva's mileage highlights the legal error in this case. The deviation from the definition of working that Guardian utilized during the internal appeals process and the rationale for its determination that Mr. DeSilva was working from the internal appeal through each stage in this litigation has resulted in the district court making factual findings that have no basis in the record. The record is simply undeveloped to respond to these new arguments that have arisen in litigation. So viewing it through the lens of Mr. DeSilva's mileage, for the first time in litigation, Guardian relied on Mr. DeSilva's mileage to argue that he was working. It never raised his mileage during the internal appeals process to support any retroactive termination of benefits. Let's say we agree with you. So let's put the mileage aside and not pay any attention to it. Guardian, it seems to me, still claims it's a sole proprietorship run just by Mr. DeSilva with clients, not new clients but continuing clients. He holds himself out as a sole proprietorship. There's one other fact I was thinking of but we have those facts and I think in particular the sole proprietorship with one office where the business is providing financial advice. To keep that business going, you have to, I think, conclude that financial advice was being provided. So that's actually my next point, Your Honor, and I believe that that is really part of the issue here where the record is not developed. During the internal appeal, Guardian determined, and this was all that Mr. DeSilva had the opportunity to respond to, was that he did own the business and that business continued to operate as you just articulated. And I think this is what you wanted to say, that he periodically checked in on the business. He stopped by the office and talked to his office manager. He tried to when he was able. The problem was that the policy links working with income. So working is not defined as working, but there is a correlation between working and any income that results from not working. That's why the fact that Mr. DeSilva has not taken on any new clients is so relevant. When he was actually doing the work, his job was to bring in new clients. That's how he made money. He was... When a client, let's say a client had invested in stock. Yes. And the client decides, I'd like to change to bonds. Yes. But isn't Mr. DeSilva the one they'd call? So they would call him, but purely for administrative purposes, Your Honor. So they would call him. He would then let Royal Alliance, this third party broker dealer and investment advisor, know that this client was wanting to change into bonds or put more money in annuities. And then Royal Alliance did all the work. So when Mr. DeSilva stepped back and was no... Even when he was working without injury? Even when he was working without injury. When he was working without injury, the only difference might be that he would say, I'm going to, you know, I'll put in the information for you to change or deposit more money or, you know, what it might be, but I would advise you to maybe think about... So putting aside, like, if he did the actual computer keying, his work before the injury was I connect the people I meet to Royal. That's essentially it. I bring in the business and I derive the money from bringing in the business. And that was his work. Do you say he wasn't working before the injury? No, he was working before the injury, but he was bringing in new clients to his business that he could then give to Royal Alliance. They would invest their money. You say his work was exclusively getting the new clients. It wasn't, in part, the work of connecting the old clients to the resources they need? So it was both, Your Honor, pre-disability, but post-disability, he didn't do the connection piece. His office manager did that connection piece. So he would, in the pre-disability world, do it all. So he would bring in the new clients, perhaps, maybe, I think of it as a glorified salesperson. He would bring in the new clients. His job was traveling around, meeting clients, bringing in the new clients. He would bring them to the business. They would say, all right, I want to buy an annuity. He would say, great. He'd fill out the paperwork, send that paperwork to Royal Alliance. Then they would take over, purchase the annuity, invest in the mutual funds, and maintain the portfolios. Mr. De Silva did not do that work. That wasn't part of his job. That's why he had the support of, well, he's had multiple supports, but of the support of Royal Alliance. Now, Royal Alliance also maintained, at that time, well, he didn't have a Royal Alliance then that had this technology framework, but he also then, at that time, maintained his marketing. As Judge Montecalvo pointed out, pre-disability, he took care of his marketing. He called his clients. He maintained his social media presence. Post-disability, MyCMO, which is a technology platform that he now pays for through Royal Alliance, maintains all his social media. So the question is, is someone actually working when all they do is own a business that they owned before, and they have hired third parties to maintain that business? I would argue that he isn't. Of course, like any business owner, he's going to make sure his business is running. He checks mail, but under any definition, including the district court's definition, which requires regularity on fixed intervals, I think is how the district court defined it, there's no way to conclude that Mr. De Silva, you can't conclude that Mr. De Silva, who tries to go into the office sometimes, who on the rare occasion talks to a client or answers a question that his assistant might have, is regularly working. Your point was as to the mileage. That was then the only fact that's inconsistent with the theory you just posited, and so he was sandbagged in the sense that, I mean, I can see Alliance did say on May 29, 2023, that one of the reasons for the decision was his income tax return imported expenses, such as auto. That's the closest it comes to mileage, but maybe that's just the cost of the car. I don't know. But in any event, what you're saying is, if that's the centerpiece, and maybe that is inconsistent with the story you just told, but no one told him that, so he didn't have a chance to respond. That's exactly it, Your Honor, and that's what ERISA contemplates. So ERISA is all about a full and fair review and notice during the internal appeals process. So when you leave the internal appeal, you have a judicial record that is fully developed. Your Honor, in the first case, brought up the issue of a fully developed record and notice. That's what's missing here, a fully developed record. Throughout this litigation, Guardian has changed its definition of working. During the internal appeal, it was material participation. That is a term of art used by the IRS. Material participation requires 500 hours of work a year. We had a vocational examiner evaluate that and found that he didn't meet that definition. In the district court, the Guardian defined working as working in any capacity and then all of a sudden turned to Mr. De Silva's tax returns as proof that he was working. He'd never, that was complete sandbagging. He had never had the opportunity to respond. In this court, now Guardian has said, it's working with regularity. He's giving investment advice. He's selling annuities. He's doing it all now. And there has just been an evolution of Mr. De Silva's so-called working that Mr. De Silva's never had an opportunity to respond to. Thank you, Your Honors. I have one other question. You provide some definitions of working that are very narrow and have exceptions even to their narrowness. Guardian provides a very broad definition. It strikes me that neither of those are correct. Is there a middle ground definition that works for working? In preparing for this argument, I decided that I didn't hate the district court's definition of working, having some regularity on a fixed schedule that results in income. There has to be that link. For you, right? Yes, that it results in income. Because that was Guardian's. That's how the Guardian's policy links it. If you're not making income, then you're disabled under the policy. So that's why there has to be that link. But I do believe that a definition of working that contemplates regularity on a fixed schedule and that work that is performed results in income is a fair definition of working. And if the court is going to adopt that definition of working, then I urge it to remand this case back to Guardian to allow Mr. De Silva to develop the record before judicial review can be contemplated. Thank you. Thank you, Your Honors. Thank you, counsel. At this time, would counsel for the appellee please introduce herself on the record to begin? Good afternoon, Your Honor. Sherry LaVar for Guardian Life Insurance, the appellee. May it please the court. Mr. De Silva contended that throughout the time he claimed to be disabled, his involvement with his business was minimal and generated only passive income. As the district court correctly held, the administrative record as a whole tells a different story. By his own admission, he was the sole proprietor of his business. He had one assistant. He went into the office. He maintained relationships with clients, and he continued to collect fees. His business deductions and income remained... There are two parts of that that are pertinent, seem to me, to be going into the office and speaking to clients. If one establishes a business and then hires someone to run it entirely and then that's it, while they may get fees and renewals and whatever, I wouldn't think they'd be working. I mean, the part that makes it working is to the extent he's managing, overseeing, making sure the business is running well, right? So, in Denobo Review, the district court is permitted to weigh the facts, resolve conflicts and evidence, and draw reasonable inferences. So here, the district court looked at Mr. De Silva's occupation of financial advising. And here, Mr. De Silva knows his clients. He knows their risk tolerance. He knows their assets. He knows any aversions to any types of investments they might have. Is there evidence he employed that during this period in some way? I mean... The district court drew the reasonable inference that he did, in fact, and he admitted himself that he maintained relationships with his clients. What they just said is their understanding of what he did is, Royall's out there. There are clients he's already got in the bank or in the bag. They call. They call the assistant. They say, I need help with converting from stocks to bonds. She says, call Royall or we'll get you in touch with Royall or however that works. And he's not part of it. If that's right, is he working? I mean, he's not doing anything at that point. Well, I think the district court drew the reasonable inference based on his occupation of financial advising. And it's a dynamic field. It's not static. You have to keep up to date on financial publications. He kept up to date on CLEs. So he had to maintain... An injured person, like let's say I'm a lawyer and I'm injured and I can't work and I do online CLE to keep going. Am I working or am I just trying to maintain myself so when I get better I can go back to work? Well, Mr. De Silva admitted that he maintained relationships with his clients and the district court correctly... Well, the district court correctly inferred that Mr. De Silva, his business is time and expertise. That's what he provides to his clients. So it's not a regular and fixed basis, right? Isn't that your definition of working that was adopted by the court? Correct. And I would underscore, I'll get to the business miles in just a moment, but Mr. De Silva, the record demonstrates that pre-disability, Mr. De Silva claimed 15,000 miles on his tax returns. Post-disability from 2016 to 2021, he claimed between 11,000 and 23,000. So there's no evidence on the record that anybody aside from Mr. De Silva drove those miles. And I have all the Guardian letters in front of me right now. Can you tell me where I can find some reference to that other than that vague reference to auto? In the May 19th, 2023 letter, your honor, and I'm looking at, I think, joint appendix 3166, Guardian provided Mr. De Silva with Judy Bogdanovich's March and April report, which outlined his business expenses, including miles, as well as auto, secretarial expenses, and cargo. Is that on 3166? Yes, your honor. It's the May 19th, 2023 letter from Guardian. So Guardian noted that Mr. De Silva continued to earn profits and business expenses outlined in the federal income tax year over year indicate that he remained involved in the business. So Mr. De Silva was made aware that his expenses were being considered as evidence of him working. And the district court, Magistrate Judge Hennessey, explained that this was sufficient, because Mr. De Silva, it was explained to Mr. De Silva that Guardian relied on these. I guess what I don't understand about that is there are many different expenses that could be taken. So you would take, let's say, the internet in the business, right? Now he owns the business, but he's not using that internet, assumed. The assistant's using the internet. He's paying for it. She's not. So it's a business expense. He writes it off. That doesn't seem to indicate to me that he's working. I agree with you, mileage is different. Someone is driving, and they're doing that. And if they're driving a lot of miles, that would be indicative of working. But the point is, it never got to that level of granularity. And he might have had a way to distinguish, like, okay, internet, electricity, those write-offs, that's one thing. In mileage, I have a different reason. And it never seemed to get to that. And yet at the district court and the magistrate judge, that becomes a very central feature of the case that seems to either have been not mentioned or in the background during the Guardian proceedings. And I guess that's what's concerning to me. The district court held that business expenses, profits, and income reported on his tax returns were used to conclude that Mr. D'Souza was working. Because like what I just said, if I set up a business, I put people in charge, and I do nothing but sit in a tropical environment and enjoy the sun, and then when it's time to do taxes, the internet that was paid is a write-off from the business. Does that mean I was working while I was sitting in the sun? I think the continuity and consistency of all of these expenses, both pre- and post-disability, indicate that there is some level of regularity. Unless he wasn't driving. There's no evidence on the record to indicate that anybody other than Mr. D'Souza was driving. That he was driving? I mean, there's just a number of miles, right? Right, but Mr. D'Souza only had one assistant. There's nothing on the record to indicate that the wife go, but her point is that's because no one asked him. Well, he was given the business expenses from Ms. Bogdanovich and told that business expenses and income were considered in Guardian's decision to determine that he was working and ultimately discontinued benefits. Can I say, there's a letter from Guardian from August of 2023 where it informs Mr. D'Souza that his benefits shouldn't have been approved because he was earning more than the maximum amount allowed under the plan. But then it also states that Guardian determined that he was disabled. And I see we have both the occupation test and the earnings test. So I guess I'm confused by that letter. Is his plan terminated because he's over the cap, right? So he's under the earnings test, he just doesn't meet it. Or is it also because he was determined not to be disabled? Or am I just misunderstanding that letter? So is your question, how could he be physically disabled? How could he both fail the occupation test, which assumes disability but working, and then also be determined not to be disabled? Working is relevant under both definitions. And irrespective of Mr. D'Souza's physical capabilities and the policy, the claimant is not disabled if they're working or if they're working and earn over that threshold. So physical capabilities alone don't determine whether a claimant is disabled. So it's the working. Correct. Working is relevant under both definitions. I'd also like to point to... Do you think the best definition for working is the one the district court adopted? I think that the district court did adopt the correct interpretation of working, especially considering that ERISA demands that plan terms be written in a manner to be understood by the average plan participant. And under federal common law principles, terms in ERISA plans should be given their plain, ordinary, and natural meaning. So I do think that the district court's definition does fit in this. Is that the one you offered in the district court? District court guardian offered working in any capacity. So the district... You didn't... Yeah. Black's law. So the district court did put that regularity piece and the income piece. So I think that that was an appropriate definition. But that was a more plaintiff-friendly definition than the one you proposed because it added regularity and fixed? Correct. And we're here to determine if the district court got it right. And here I think they did in their definition of working. Do you agree it's an error-requiring remand if the district court relied substantially on facts that it doesn't appear there was adequate opportunity to contest in the administrative proceeding before guardian? Well, no, Your Honor, because I do believe that Mr. DeSilva was given an opportunity to contest guardian's findings. For example, in that May 19, 2023 letter, the expenses were outlined. And Mr. DeSilva had an opportunity to respond and he did in fact respond. That's just what happened. But legally, if there's a fact and then you're on de novo review and the judge looks at that fact, is a response by the party who loses based on that fact to say, I didn't get a chance to really contest that fact in the administrative proceeding? Is that a legitimate argument to make in a de novo review of an insurer's decision? Well, if it had to be remanded, Your Honor, I think that a more appropriate remand would be to just disregard any tax-related arguments instead of a full remand for a record. A full remand for a review of the whole record? Right, because the district court has already already done that and concluded that Mr. DeSilva was working. I see that I am out of time, Your Honor, so unless you have any more questions, can I briefly conclude? Please. In sum, the district court interpreted the term working consistent with ERISA principles, weighed the record as a whole, and drew reasonable inferences. The district court committed no clear error in doing so. Therefore, a guardian asks that this court affirm the district court's decision. Thank you, Your Honors. Thank you, Counsel. Counsel, at this time, please reintroduce yourself on the record. You have a two-minute rebuttal. I wanted to make one clarification, Your Honors. There's a difference between what Mr. DeSilva's business did and what Mr. DeSilva did. My colleague was speaking about what his business did. His business maintained relationships with his clients. Mr. DeSilva, on the other hand, testified under oath in his affidavit that he rarely, on a rare occasion, spoke to his clients. Very two different concepts. Guardian focused solely on what his business did when it denied benefits. The August letter that Judge Montecava pointed to, the August final denial, states, we don't define working. Furthermore, the policy does not define the term working. However, as previously stated, based on your report, as well as Mr. DeSilva's, he remains a sole owner of the business and continues to be materially involved in the operations and decision making, which results in continued earnings. So there is a link, but they are conflating Mr. DeSilva's business with whether Mr. DeSilva is working. Finally, as to the May 19, 2023 letter, that letter doesn't speak to his mileage or his expenses. If he was materially involved in the operations, that would be working, right? If he was materially involved in the operations, but speaking to a client on a rare basis or trying to go to the office whenever he's able does not make him materially involved. There's no regularity that links to the income that's being generated, except in the district court's definition. But that's not what the Guardian did, at all, during the internal appeals process. And what it did in that May 19 letter, when it provided Ms. Boganovich's report to us for review and response, is not articulate the expenses, your honors. What it did on page 3171 is provide a bullet point of information that it required from Mr. DeSilva. Not one of those bullet points speaks to Mr. DeSilva's expenses. What it speaks to are his employees and their qualifications for working and his social media accounts. Thank you, your honors. Thank you, counsel. That concludes argument in this case.